HERRICK, FEINSTEIN LLP
Stephen B. Selbst
George V. Utlik
Rachel Ginzburg
2 Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
gutlik@herrick.com
rginzburg@herrick.com

*Attorneys for Apex Executive Jet Center, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :   Case No. 20-11831 (MEW)
                                                            :
All in Jets, LLC d/b/a JetReady,                            :   Chapter 11, Subchapter V
                                                            :
    Debtor.                                 :
                                                            :
------------------------------------------------------------x

**OBJECTION OF APEX EXECUTIVE JET CENTER, INC.**
**TO ALL IN JETS, LLC d/b/a JETREADY'S (I) MOTION TO SELL**
**SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS IN A 363 SALE;**
**AND (II) CHAPTER 11 SUBCHAPTER V PLAN OF REORGANIZATION**

Apex Executive Jet Center, Inc. ("Apex"), by its counsel, Herrick, Feinstein LLP, files this objection (the "Objection") to: (I) *Debtor's Chapter 11 Subchapter V Plan of Reorganization* [ECF No. 43] (the "Plan"); and (II) *Debtor-in-Possession's Motion for Entry of an Order: (A) Authorizing the Free and Clear Sale of Substantially All Assets of the Debtor to a Bona Fide Purchaser; (B) Approving Sale and Bid Procedures; (C) Setting Forth Objection Deadlines and Related Dates With Respect to the Proposed Sale; (D) Finding That the Form of and Notice of Sale are Sufficient; (E) Scheduling a Subsequent Hearing on Final Approval of the Sale, and Confirmation of the Debtor's First Amended Plan of Reorganization; and (F) Granting Related*

1

*Relief* [ECF No. 47] (the "Sale Motion"), which were filed by the above-captioned debtor (the "Debtor"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Without explanation, the Debtor filed both the Sale Motion and the Plan, each proposing a mutually exclusive but equally fruitless course of action with respect to a distribution of the estate's property to the Debtor's constituencies, including unsecured creditors.

2. In the Sale Motion, the Debtor proposes to sell its most valuable asset, the Part 135 Certificate (as hereinafter defined), to Aviate Jet Group, LLC (the "Stalking Horse") for $600,000. Yet, the procedures set forth in the Sale Motion do not foster a fair or open sale process that would maximize the value of the Part 135 Certificate. The Sale Motion, among other things, (a) imposes an artificial and arbitrary bid deadline, (b) provides no information concerning any marketing of the Debtor's assets that has taken place to date, (c) proposes no plan to market the Part 135 Certificate to obtain higher and better bids, and (c) provides the Stalking Horse with bid protections that are entirely unwarranted, given the realities of this case. Therefore, the Court should deny the Sale Motion outright.

3. The Court should also deny confirmation of the Debtor's Plan[1] because it is proposed in bad faith and is neither feasible nor fair and equitable. The Plan proposes a $600,000 investment by an unidentified investor (the "Mystery Investor"), who would acquire all of the Debtor's equity on undisclosed terms. Despite the fact that the transaction with the Mystery Investor is a *de facto* sale of the Debtor, the Debtor has failed to provide any meaningful disclosure about the terms of the sale, the Debtor's efforts to market and sell its equity, or whether the Mystery

---

[1] While the Sale Motion mentions a "First Amended Plan," (*see Sale Motion*, ¶ 1), no amended Plan has been filed to date.

2

Investor has any ties to the Debtor's insiders, leaving creditors uninformed about whether the proposed transaction represents the highest and best value for the Debtor's assets.

4. While the Mystery Investor has committed to fund $600,000, the Debtor's projections in the Plan show $0 in disposable income (as defined in 11 U.S.C. § 1191(d)) for each of the five years of the proposed payments to be made to creditors under the Plan. It beggars belief that the Mystery Investor would invest $600,000 if it truly believed that the Debtor would be inactive for five years. It seems far more likely that the Mystery Investor received different projections from the Debtor that show sufficient revenue and cash flow to justify such an investment. The corollary is that if the Debtor will have disposable income, creditors are entitled to receive payments from that income stream. Yet, the Plan's sole and limited source of payment for creditors is the $600,000 from the Mystery Investor.

5. The Plan is also opaque on what – if anything – general unsecured creditors will receive.[2] Under the Plan, the funding of $600,000 will be used to satisfy unclassified administrative claims and priority tax claims, Class 1 priority wage claims, and Class 2 general unsecured claims. *See Plan*, art. II. The Plan estimates that professional fees and other administrative expenses will total approximately $50,000. *Plan*, art. IV.A.1. The Plan acknowledges that the priority employee wage claims are $28,010.36. *Plan*, art. XI.A. As to priority tax claims, the Plan asserts – without explanation or analysis – that the correct amount of the tax claim of the Internal Revenue Service (the "IRS") is $460,000, despite the fact that the filed proof of claim of the IRS is for $1,158,036.62, of which $1,026,532.49 is asserted as a priority claim.[3] If all allowed administrative claims, priority wage claims, and priority tax claims, including the IRS's claim, exceed $600,000, general unsecured creditors will have no recovery. Compounding the uncertainty is the size of the

---

[2] The Plan states that a "return to general unsecured creditors [is] approximately $25,000.00." *Plan*, art. XII.C.2.
[3] The Plan states that the IRS's priority tax claim is disputed. *See Plan*, art. I.D.2, n.1.

HF 13617372v.18

general unsecured creditors' pool. Although the Debtor asserts that it has unsecured debt of approximately $5 million, *Plan*, art. I.C., the total amount of claims filed against the Debtor is $16,577,487.54.[4] As a result, it is impossible to determine with any certainty what general unsecured creditors may recover under the Plan.

6. Despite the fact that the Debtor's Statement of Financial Affairs discloses $2,263,485.08 in transfers made to its insiders in the one year before the Petition Date,[5] the Plan ignores this potentially viable asset, which could provide a meaningful source of recovery for the Debtor's unsecured creditors. Moreover, the Debtor's creditors may have additional undisclosed avoidance claims for prior periods against the Debtor's insider, Seth Bernstein.

7. For all of these reasons, the Plan fails to make necessary disclosures that would assist the Debtor's creditors in making an informed judgment when voting on the Plan and otherwise violates sections 1190 and 1191 of the Bankruptcy Code, among other sections. The issues identified here show a manifest lack of good faith, which renders the Plan unconfirmable.

8. In sum, the central problem with the Debtor's proposed course of action is that the Debtor cannot be pursuing both the Sale Motion and the Plan at the same time because the relief sought is inconsistent. In the Plan, The Debtor proposes to sell not only (i) 100% of newly-issued equity interests to the Mystery Investor under the Plan but also (ii) the Part 135 Certificate to the Stalking Horse under the Sale Motion. While the Sale Motion implicitly supplants the Plan, reorganization under chapter 11 of the Bankruptcy Code is not supposed to be a mystery. If the Debtor is abandoning the Plan in its current form in favor of the Sale Motion, it should have said so in plain English.

---

[4] *See* Southern District of New York Claims Register for the Debtor, All in Jets, LLC, Case No. 20-11831-mew, available at https://ecf.nysb.uscourts.gov/cgi-bin/SearchClaims.pl?453328833546503-L_1_0-1.
[5] *See Statement of Financial Affairs* [ECF No. 26].

4

## BACKGROUND

9. On August 9, 2020 (the "Petition Date"), the Debtor commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

10. The Debtor asserted that it is a small business debtor under section 101(51D) of the Bankruptcy Code. The Debtor remains in possession of its property and continues to manage its business as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

11. Yann Geron, Esq. was appointed as the Subchapter V Trustee (the "Trustee") in this Chapter 11 Case [ECF No. 4].

12. The Debtor's primary asset is its Part 135 certificate (the "Part 135 Certificate") issued by the Federal Aviation Administration (the "FAA") and the Standard Operating Procedures, manuals, and protocols, as well as staff that are attendant to the Part 135 Certificate, which the Debtor valued at $625,000. *See Affidavit of Seth Bernstein Pursuant to Local Bankruptcy Rule 1007-2* [ECF No. 7] (the "Bernstein Affidavit"), ¶ 6.

13. On September 18, 2020, Apex filed its *Notice of Continued Perfection of Liens under Section 546(b) of the Bankruptcy Code* [ECF No. 29] and its *Motion for Order Granting Relief from the Automatic Stay under Section 362(d) of the Bankruptcy Code* [ECF No. 30] (the "Lift Stay Motion"). The Court granted the Lift Stay Motion by entering its Order Granting Relief from the Automatic Stay [ECF No. 37]. On October 12, 2020, Apex filed its Proof of Claim in the amount of $238,127.56 against the Debtor (the "Apex Claim"), asserting that the claim is secured by liens on the five aircraft identified in the Apex Claim. Therefore, Apex has standing to object to confirmation of the Debtor's Plan under section 1109(b) of the Bankruptcy Code.

HF 13617372v.18

14. On November 9, 2020, the Debtor filed the Plan. To date, the Debtor has filed no notice setting a deadline to object to the Plan or a hearing on confirmation of the Plan.

15. On December 21, 2020, the Debtor filed the Sale Motion. In the Sale Motion, the Debtor asks the Court, among other things, to schedule a hearing on final approval of the sale and confirmation of the Debtor's "First Amended Plan of Reorganization." Sale Motion, ¶ 1. As of this date, the Debtor has not filed its First Amended Plan of Reorganization.

## ARGUMENT

### I. The Procedures Set Forth in the Sale Motion Are Not Fair or Reasonable and Present a Threat to the Debtor's Ability to Maximize Value of the Estate

16. The Sale Motion has not provided this Court with any evidence that the Debtor has a sufficient business reason to justify the proposed sale. When a bankruptcy court evaluates a section 363(b) application, the Second Circuit requires that the court "expressly find from the evidence presented before [the court] at the hearing a good business reason to grant such an application." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

17. "A determination that there are sufficient business reasons to justify a particular sale depends on the facts and circumstances of each particular case." *In re Allard*, 2019 WL 4593854 at *4 (Bankr. S.D.N.Y. Sept. 20, 2019) (citing *Lionel*, 722 F.2d at 1071-72). In a chapter 11 case, courts should consider the following factors:

> (1) the proportionate value of the asset to the estate as a whole, (2) the amount of time elapsed since the filing, (3) the likelihood of proposing and confirming a reorganization plan in the near future, (4) the effect of the proposed sale on any reorganization, (5) the sale price to be obtained with reference to any appraisals of the property, (6) alternative uses of the property, and (7) whether the asset is increasing or decreasing in value.

*Allard*, 2019 WL 4593854 at *4 (citing *Lionel*, 722 F.2d at 1071). Here, the Debtor has failed to provide evidence that would allow the Court to properly evaluate the applicable factors. The

Debtor has not even provided information about the marketing process or the value of the assets, except to offer its unsupported opinion and legal conclusion that the sale to the Stalking Horse "is fair and reasonable and is in the best interests of its creditors and the estate." Sale Motion, ¶ 21.

18. The Sale Motion provides no meaningful information regarding the Stalking Horse, how it was selected, how the purchase price was negotiated, and whether there are any existing or future ties between the Stalking Horse and the Debtor. Although a sale under section 363 of the Bankruptcy Code does not require this Court's approval of a disclosure statement, courts have long insisted on full disclosure of all material terms where a debtor proposes to sell substantially all of its assets. *See In re Flour City Bagels, LLC*, 557 B.R. 53, 82 (Bankr. W.D.N.Y. 2016) ("Because the proposed sale of substantially all of the Debtor's assets is the functional equivalent of a plan, the creditors and parties in interest are entitled to the functional equivalent of a disclosure statement."). *See also In re Family Christian LLC,* 533 B.R. 600, 626 (Bankr. W.D. Mich. 2015); *In re Exaeris Inc.,* 380 B.R. 741, 744 (Bankr. D. Del. 2008).

19. Although the Sale Motion provides no information about the Stalking Horse, an internet search discloses that the Florida Secretary of State lists the Stalking Horse as a valid Florida limited liability company, with an address at 1111 Lincoln Road, a business building in downtown Miami Beach. Yet, Aviate Jet Group, LLC does not appear to have a website or other physical presence. In the Florida Secretary of State records, Matthew Winer is listed as the principal of Aviate Jet Group, LLC, but an internet search reveals that he is also the principal of Jet Management Associates, a firm that is in the aviation consulting business.[6] While it is possible that Aviate Jet Group, LLC is a bona fide business with no ties to the Debtor, the lack of

---

[6] *See* Jet Management Assoc., http://jmajets.com/ (last visited Jan. 4, 2021).

information and potential multiple roles of Matthew Winer are unusual and cry out for additional disclosures.

20. Most importantly, the procedures and sale described in the Sale Motion are not based on any business reason and were made in contravention of the central purpose of the Bankruptcy Code, i.e., the maximization of the value of the estate for the benefit of the Debtor's creditors. *See In re Midway Airlines, Inc.*, 6 F.3d 492, 494 (7th Cir. 1993) ("[O]ne of the Code's central purposes [is] the maximization of the value of the bankruptcy estate for the benefit of creditors.") (cited by *In re Eastman Kodak Co.*, 495 B.R. 618, 623 (Bankr. S.D.N.Y. 2013)).

21. The Sale Motion provides for a $600,000 purchase price, consisting of (a) $50,000 to be paid at closing, and (b) a note for $550,000 delivered "requiring payments of $50,000 in six months and then monthly payments over eighteen months of principal and interest at 3%." *See Sale Motion*, ¶ 17(c). In other words, and contrary to the Debtor's assertion that the purchase price is $600,000, the actual consideration for the proposed sale is only $50,000, while the rest of the consideration is likely to be paid out of the reorganized debtor's post-confirmation revenues.

22. The Debtor claims that "[p]rior to and concurrent with the Debtor's filing for bankruptcy protection, Debtor's management and bankruptcy counsel began marketing its only significant asset: the U.S. FAA Part 135 Certificate." *Sale Motion*, ¶ 15. The Sale Motion is otherwise bereft of information concerning the Debtor's marketing efforts. Moreover, while the Debtor represents that the proposed sale will be "private, provided, however, that the proposed sale be subject to higher and better offers," *see Sale Motion*, ¶ 21, the Debtor has failed to provide how it intends to solicit such higher and better offers.

23. Additionally, the Overbid Requirement (as defined in the Sale Motion) that each and every subsequent bid be at least $80,000 higher than the $600,000 purchase price, *see Sale*

*Motion*, ¶ 26(b), is unreasonable because the current bid consists of only $50,000 in cash and a $550,000 note that must be repaid with interest at 3%. The Overbid Requirement would limit potential bidders from coming up with better offers. For example, a bid of $600,000 in cash at closing would be a better offer because the Debtor's creditors would receive a recovery quicker and have assurances that they will get the entirety of their proposed recovery under a plan.

24. Further, the various bid protections set forth in the Sale Motion for the benefit of the Stalking Horse operate to chill bidding and should be denied. The Sale Motion, for example, (i) gives the Stalking Horse the right to cancel the transaction if it does not close by January 30, 2021;[7] and (ii) entitles the Stalking Horse to a break-up fee of $30,000 at closing, which break-up fee shall constitute a super priority administrative expense. *See Sale Motion*, ¶¶ 21(f), (g).

25. While the business judgment of the Debtor is the standard applied under the law in this district, "the subject court is charged with the duty of reviewing the agreement to determine that it is reasonable in relation to the bidder's efforts and the magnitude and significance of the transaction, and will enhance rather than detract from the bidding process." *See In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992). Here, the Stalking Horse has the unilateral discretion to cancel the sale if it does not close in a month (less, if the holidays are taken into account). Such timeline is not reasonable and will certainly chill bidding, especially considering that the Debtor has no plans to market its assets. Further, the Stalking Horse is entitled to a break-up fee of 5% of the Debtor's total purchase price (which is high, compared to the usual 2-3% break-up fee allowed in this district) and **60%** of the cash portion of the Debtor's purchase price. This break-up fee is patently unreasonable.

---

[7] This provision is especially concerning when viewed in light of provisions within the sale order, dictating that the overbid deadline be February 16, 2021, at 12:00 PM. *See Proposed Order to the Sale Motion*, ¶ 8.

26. The timeline for closing should be much longer than one month—Apex proposes that the timeline should be moved forward at least sixty (60) days. Further, based on the economic realities of this case, any break-up fee granted to the Stalking Horse should be capped at three percent (3%) and should only apply to the cash portion of the sale (i.e., $50,000). Further, any break-up fee should only be paid from the proceeds of an alternative transaction, without which, the Stalking Horse should be entitled to no claim for the bid protections. As further set forth below, even a purchase for $600,000 in cash, which this is not, would not provide the Debtor's general unsecured creditors with a meaningful recovery in this case.

**II.     The Plan Demonstrates Bad Faith**

27. This Plan has been proposed in bad faith. Section 1191(a) provides that the Court shall confirm a plan under Subchapter V *only* if all of the requirements of section 1129(a) (other than paragraph 15) of the Bankruptcy Code are met. *See, e.g., In re Motif Diamond Designs, Inc.*, 2020 WL 7212713 at *1 (Bankr. E.D. Mich. Dec. 4, 2020) (order denying confirmation of a subchapter V plan because the Plan did not comply with § 1129(a)(1)). The Plan violates section 1191(a) of the Bankruptcy Code because the Plan, among other things, fails to satisfy section 1129(a)(3) of the Code, which requires that the Plan be filed in good faith.

28. In the Second Circuit, a plan is filed in good faith if it "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 174 (2d Cir. 2008). "By contrast, a plan that, for instance, is proposed for ulterior motives not aligned with the Bankruptcy Code, will fail to satisfy section 1129(a)(3)." *In re Ditech Hold. Corp.*, 606 B.R. 544, 578 (Bankr. S.D.N.Y. 2019) (*citing In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984)).

10

29. The Plan's $600,000 investment by the Mystery Investor to be made on undisclosed terms illustrates the Debtor's lack of good faith. A sale by the Debtor of 100% of its equity is functionally a sale of the Debtor, but the Debtor has made no disclosures about: (a) how the Mystery Investor was identified; (b) how the terms of the investment were negotiated; (c) whether the amount being invested by the Mystery Investor represents the highest and best value for the Debtor's equity – or even a fair value; and (d) whether the Mystery Investor has any ties to Seth Bernstein, the Debtor's sole member. Nor does the Debtor explain why the proposed payments under the Plan are stretched over five years.

30. In *Bank of America Nat'l Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), the United States Supreme Court observed that where a debtor proposes to sell its assets, "the best way to determine value is exposure to a market." 526 U.S. at 457. Recently, this Court has noted that precedent "mandate[s] that a debtor market-test a proposed transaction in order to demonstrate that the purported new value was necessary and reasonably equivalent, and was not merely an exclusive opportunity for old equity to gain advantages at the expense of creditors." *In re Latam Airlines Group S.A.*, 620 B.R. 722, 803 (Bankr. S.D.N.Y. 2020). Other courts have similarly held that the market test rule applies to sales of a debtor's equity under a plan. *See In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013) ("A plan of reorganization that includes a new investment must allow other potential investors to bid.").

31. Nothing in the Plan suggests that this Debtor has exposed its assets to the market in any way; nor has the Debtor allowed other investors to bid on its equity. The Debtor's proposal of the Plan, which is cloaked in secrecy and does not provide for a formal bidding process for the Debtor's equity, demonstrates bad faith. Accordingly, confirmation of the Plan would be contrary to precedent and established principles.

32. In addition, the Plan's disclosure of claims asserted against the Debtor is occult. Although the Plan identifies existing priority claims, *Plan,* at *Appendix 1*, it only lists a few of the general unsecured claims filed against the Debtor. *Id*. The entire pool of filed claims, which claims are *prima facie* valid under Bankruptcy Rule 3001, and which total over $16.5 million, are available on the Court's Claims Register.[8] Yet the Debtor asserts in the Plan that unsecured claims total no more than $5 million. *Plan*, art. I.C. Moreover, as noted above, the Plan asserts that the priority claim of the IRS is for $460,000, but the *prima facie* valid claim of the IRS is for approximately $1.16 million, of which $1.027 million is claimed as a priority amount.

33. Further, the Plan contains no analysis of potential preference or fraudulent conveyance claims against any insiders, which indicates bad faith and raises concerns that the Debtor is attempting to shield its insiders from liability at the expense of its creditors. *See, e.g., In re Quigley Co., Inc.*, 437 B.R. 102, 131 (Bankr. S.D.N.Y. 2010) ("Furthermore, a plan based on a lockup agreement that secures an advantage for insiders at the expense of the creditors is not one proposed in good faith."); *In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462 (N.D. Fla. 2011) ("Essentially, the Plan is designed to utilize bankruptcy law to re-arrange the priorities of the existing three secured creditors in order to benefit the Debtor's insiders/guarantors. This is the opposite of the intended purpose for Chapter 11 relief and is not good faith. Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of reorganization.").

34. Indeed, the Debtor's Statement of Financial Affairs indicates $2,263,485.08 was paid to insiders within one year before the filing, but the Plan does not provide for an investigation of potential actions against any of the insiders or explanations as to why such actions would not

---

[8] *See* supra note 4.

be fruitful. *See Statement of Financial Affairs* [ECF No. 26]. Nor has there been any apparent analysis of avoidance claims that may exist for prior periods. Given that unsecured creditors face the prospect of either no recovery or, at best, pennies on the dollar of their claims, potential avoidance actions are an obvious and critical source of additional recovery.

35. The Plan contains other material inconsistencies that similarly betoken a lack of good faith. For example, the Plan boasts that the Debtor has "a floating charter fleet of heavy to midsize jets including Gulfstream GICSPs, Gulfstream GICs, Challenger 601s and Hawker 800 models." *Plan*, art. I. Yet the Debtor has told this Court that its only asset is its Part 135 Certificate, *Bernstein Aff*., at ¶7, and that it had no existing aircraft leases. Similarly, the Schedules of Assets and Liabilities filed by the Debtor [ECF No. 25] disclosed no pre-petition aircraft leases. Moreover, the Debtor has sought no authorization from this Court to enter into any post-petition aircraft leases. These inconsistencies raise further issues of whether: (a) the Debtor has omitted to schedule existing aircraft leases; (b) the Debtor has entered into post-petition aircraft lease agreements, without seeking approval from this Court; or (c) no such aircraft leases exist, and the Debtor has made a material misrepresentation in the Plan.

36. Each of these improprieties indicates that the Plan was not proposed in good faith.

**III.  The Plan Fails to Comply With Section 1190 of the Bankruptcy Code**

37. Under section 1190, a plan filed under Subchapter V must include: "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization . . . ." 11 U.S.C. § 1190(1).

38. The Plan provides a limited history of the Debtor's business operations and a bare-bones liquidation analysis. *See Plan*, art. I.A; art. XII.A. Notably, although the Plan provides for a

13

$600,000 investment, the liquidation analysis purports to value the Part 135 Certificate at $0 (*Plan*, art. XII.A), despite the fact that the Bernstein Affidavit values the Part 135 Certificate at $625,000. *Bernstein Aff.*, at ¶ 6. The only explanation offered by the Debtor for this discrepancy is that the Part 135 Certificate is "non-fungible." Even if the Debtor does not pursue a reorganization as a stand-alone entity, the Debtor has not explained why it could not sell an asset that it valued at $625,000 in a liquidation.

39. The Plan's five-year projections are suspect and improbable, estimating $0 in total income and disposable income for the next five years, despite the Debtor's claim of having access to a fleet of charter aircraft. *See Plan*, *Appendix 2* (stating that "[t]he business operations of the Debtor ceased in 2020 due to the large amount of unsecured debt and the COVID-19 pandemic affecting the travel industry. Therefore, on that basis, the Debtor does not have sufficient information to project its future income at this time.").

40. While the COVID-19 pandemic has disrupted many businesses, including the Debtor's, the Debtor's projections of $0 in revenue for the next five years are not plausible.[9] It stretches credulity to believe that the Mystery Investor would invest $600,000 on a business that could not project any level of revenue for five years. Indeed, a December 18, 2020 Wall Street Journal article that surveyed business economists observed that the United States economy "could be rebounding more swiftly than imaginable" in 2021.[10] Thus, the Debtor's failure to provide the required projections that forecast the Debtor's income and disposable income for the five-year period of payments contemplated by the Plan violates section 1190(1)(c) of the Bankruptcy Code.

---

[9] In contrast, the Debtor had revenue in the amount of $7,285,543.00 in 2019. *See Statement of Financial Affairs* [ECF No. 26].

[10] Justin Lahart, *For America's Economy This Winter, a Covid Freeze and Then a Vaccine Thaw*, Wall Street J., Dec. 18, 2020, https://www.wsj.com/articles/for-americas-economy-this-winter-a-covid-freeze-and-then-a-vaccine-thaw-11608287401.

## IV. The Plan Is Devoid of Evidence That It is Feasible

41. The Plan is not feasible. Section 1129(a)(11) of the Bankruptcy Code contains the "feasibility test." *Ditech*, 606 B.R. at 576. "It requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan." *Id*. "The standard for whether a plan is feasible is 'whether the plan offers a reasonable assurance of success.'" *In re: RAMZ Real Estate Co.*, 510 B.R. 712, 720 (Bankr. S.D.N.Y. 2014) (citing *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988)). "In making this determination, a bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *Id*. (citations and internal quotations omitted).

42. The Debtor has failed to provide any information for the creditors and the Court to determine whether the Plan offers a reasonable prospect of success and is feasible. Indeed, the Debtor has made only one comment concerning the Plan's feasibility, stating that "following confirmation, and competition (sic) of all payments under this Plan, the business of the Reorganized Debtor will not be liquidated, nor will there be a need for further financial reorganization." *See Plan*, art. XII.B. This self-serving bald assertion does not provide this Court or the Debtor's creditors with reasonable assurance of the Plan's success. *See Quigley*, 437 B.R. at 142 ("To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations."); *see also In re Prudential Energy Co.*, 58 B.R. 857, 863 (Bankr. S.D.N.Y. 1986) ("[A] plan based on impractical or visionary expectations cannot be confirmed. . . . [The president] testified that he has continuing contacts with prospective investors. But that unsubstantiated and optimistic testimony hardly rises to the level of orders in hand.").

HF 13617372v.18

43. In addition, the Debtor's creditors are being made into involuntary lenders because their payments are unreasonably deferred over five years. *See Plan*, art. II. The Debtor presents no business or other justification for such treatment. In fact, the Debtor does not even specify when the Mystery Investor will fund the $600,000, only stating that "the Debtor's new equity holders will infuse $600,000 over time to be used to pay creditors." *Plan*, art. I.C. This statement, along with the fact that the Mystery Investor is not identified, provides this Court and the Debtor's creditors with no assurance that the $600,000 will be funded and paid as contemplated.

44. Moreover, the proposed $25,000 recovery to the Debtor's general unsecured creditors is contingent on the Debtor's ability to significantly reduce the IRS's claim from the amount indicated in its proof of claim—$1,158,036.62—to the amount that the Debtor asserts, without explanation, is the correct amount of the IRS's claim—$460,000. The Debtor provides no evidence or reason supporting the reduction of the IRS's claim by approximately 60%. If the IRS's claim is accurate, the general unsecured creditors will receive nothing. As a result, creditors cannot determine how to vote on the Plan, and the Court cannot confirm a plan that will either pay general unsecured creditors $25,000[11] or nothing, depending on whether the Debtor's assertion that the IRS's claim is incorrect turns out to be true.

45. For the reasons set forth above, the Plan is not feasible and violates section 1129(a)(11) of the Code because it has less than a reasonable prospect of success and is not workable.

---

[11] The Plan states that the "return to general unsecured creditors [is] approximately $25,000.00." *Plan*, art. XII.C.2. The Plan's calculations, however, appear to be inaccurate because of the $600,000 allocated for creditors, $50,000 would be paid to holders of administrative claims, $28,000 would be paid to holders of priority wage claims, and the estimated $460,000 would be paid to the IRS on account of it priority claim – leaving $62,000 to the general unsecured creditors. The Debtor has failed to account for the difference.

## V. The Plan Is Not Fair and Equitable

46. The Plan is not fair and equitable. Under section 1191(b) of the Bankruptcy Code, the Court may confirm a plan that is rejected by a class of creditors if the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." If the Debtor's General Unsecured Creditors reject the Plan, the Court cannot find that the Plan is fair and equitable.

47. The condition that a plan be fair and equitable includes the following requirements:

   (1) With respect to a class of secured claims, the plan meets the requirements of section 1129(b)(2)(A) of this title.

   (2) As of the effective date of the plan—

   A. the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or

   B. the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.

   (3) (A)(i) The debtor will be able to make all payments under the plan; or

   (ii) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

   (B) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that payments are not made.

11 U.S.C. § 1191(c)(1)-(3).

48. Applying the requirements, the Debtor's projections of future income and expense demonstrate that the Plan is not fair and equitable. The sparse information that is provided in the Plan is inconsistent and inherently implausible. The Plan does not provide that the creditors will receive any of the Debtor's projected disposable income (as defined in 11 U.S.C. § 1191(d)) in the

17

next five years. *See Plan*, *Appendix 2*. Indeed, the Debtor represents that it will have no projected disposable income over the next five years. *See id*. Although the Debtor states that the Mystery Investor is prepared to invest $600,000, the Debtor claims that it cannot project whether it will have any disposable income for the next five years. *Plan*, *Appendix 2*. If that dubious assertion were true, it is unclear why the Mystery Investor would invest in the Debtor. It seems far more likely that the Debtor has shared more optimistic projections with the Mystery Investor. If, as Apex suspects, the Debtor projects that it will have revenues and profits over the next five years, the Debtor's creditors are entitled to additional payments from the Debtor's disposable income under the Plan. *See* 11 U.S.C. §§ 1191(c)(2); 1191(d).

49. Moreover, the Plan provides no information concerning the identity of the Mystery Investor or the Mystery Investor's financial wherewithal. As a result, the Debtor provides no evidence suggesting a "reasonable likelihood" that the Debtor will be able to make all payments under the Plan. The Plan also provides no remedy if the Mystery Investor fails to fund the payments under the Plan. Indeed, the Plan contains a mechanism for notice of default and cure, but no remedy and no relief to the creditors if the default is not cured. Specifically, the Plan states:

> Any creditor asserting a default in payments to be made under this Plan shall notify the Debtor not less than three (3) days after the occurrence of such default. If, after fourteen (14) days following actual receipt by the Debtor of such notice, the Debtor has not cured such default, then upon notice and an opportunity for hearing, the Debtor will request that the Court hold a status conference to discuss the possibility of conversion, dismissal, or removal of the debtor-in-possession.

*Plan*, art. XII.D.

50. Therefore, the Plan is not fair and equitable and cannot be confirmed.

**VI. The Debtor Is Not Entitled to Discharge under 11 U.S.C. § 1141(d)**

51. The Debtor is not entitled to receive a discharge under section 1141(d) of the Bankruptcy Code because the Plan cannot be confirmed under section 1191(a).

18

## RESERVATION OF RIGHTS

Apex expressly reserves its rights to further address the Sale Motion, the Plan, and any ancillary issues and to respond to any party, either by further submission to this Court, or at oral argument to be presented at any hearing.

## CONCLUSION

**WHEREFORE**, Apex respectfully requests that the Court deny the Sale Motion and confirmation of the Plan at this time and grant such further relief as this Court deems proper under the circumstances.

Dated: January 4, 2021  
      New York, New York

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By: */s/ Stephen B. Selbst*  
Stephen B. Selbst  
George V. Utlik  
Rachel Ginzburg  
2 Park Avenue  
New York, NY 10016  
(212) 592-1400  
(212) 592-1500 (fax)  
sselbst@herrick.com  
gutlik@herrick.com  
rginzburg@herrick.com

*Attorneys for Apex Executive Jet Center, Inc.*

HF 13617372v.18